THE STATE ex rel. EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES v. W. D. VANDIVER, Superintendent of Insurance of the State of Missouri.

In Banc, July 9, 1909.*

1. **CONSTITUTIONAL LAW: Wisdom.** It is not for the courts to say that a law is unwise. That objection should be addressed to the Legislature. The courts have to do only with the constitutionality and the interpretation of laws.

2. ————: **Insurance Companies: Salaries: Act of 1907: Applicable to All Companies.** The Act of 1907, which provided that "no life insurance company which pays as a salary . . . more than fifty thousand dollars per annum to any one person shall be licensed to transact business in this State," applies to all life insurance companies, both those theretofore licensed to do business in the State and those that might thereafter seek to enter. The purpose of the Act, as shown by current history, was to prevent life insurance companies from paying their officers or agents a compensation in excess of what the Legislature thought their services were really worth, and thereby to prevent a misappropriation and waste of assets that belong to policy-holders.

3. ————: **Title: Insurance Company: Salary: License.** An act whose title is, "An Act relating to the Salaries and Compensation of Officers and Agents of Life Insurance Companies," relates to only one subject and that subject is clearly enough

---

Note.—Decided May 22, 1909. Motion for rehearing filed. Rehearing denied July 9, 1909.

State ex rel. v. Vandiver.

expressed therein, although in one section the act says that no company which pays to any person a salary in excess of fifty thousand dollars shall be licensed to do business in this State. The act does not attempt to fix the compensation the companies may pay, nor does it provide for their expulsion from the State; it simply says that companies which do not possess certain prescribed qualifications shall not be licensed to do business in the State, and a provision for withholding a license to those companies who do not possess those qualifications is in harmony with and germane to the title.

4. ——: ——: ——: License: Contract: Impairment. A license issued to a foreign corporation to do business in this State for one year is not a contract between the State and the company, but is a police regulation, which may be amended or repealed at any time. The State is under no legal obligation to renew the license upon its expiration, nor would its refusal to renew have the effect of impairing the legal obligations of contracts prior thereto entered into between the foreign company and third persons, nor would the voluntary withdrawal of the company have such effect. The only effect of a refusal to renew would be to prevent the company from making thereafter any new contract or transacting any new business.

5. ——: Foreign Corporations: Power of State. The General Assembly may impose on foreign corporations such terms as it may deem proper as a condition to their right to do business in this State, and it may entirely exclude them from coming into the State at all for the transaction of business here.

6. ——: ——: Former License: Investments: Power to Issue Perpetual License. The granting by the State of a license year by year to a foreign insurance company for many years, and the investment by the company of large sums of money within the State in reliance upon the statute in force when the investments were made and the former licenses were granted, does not constitute an implied contract between the State and the company that precludes the State from imposing other conditions upon the company with which it must comply in order to obtain a further license from the State to do business here. The imposition of such additional conditions, under the circumstances, does not violate any constitutional right of the foreign company. The State did not enter into any such contract with the company, but simply granted it year by year a license or permit to do business here for one year; and the Legislature had no power to authorize any such a contract, for to have done so would have been to have contracted away its police powers, which means its right to govern.

7. ———: ———: Internal Affairs. A statute which denies to a foreign insurance company which pays to any person a salary in excess of fifty thousand dollars a license to do business in this State, is not an attempt to regulate its internal affairs. It simply prescribes that such a company must voluntarily perform a certain condition as its right to do business within the State.

8. ———: Public Corporations: Police Powers. A life insurance company is a public institution, insuring members of the public, for private gain, and as such it is subject to the control and supervision of the State, under the exercise of its police powers; and, under those powers, if a domestic corporation, the Legislature may enact such laws regulating its internal affairs as will safeguard and protect the interests of its policy-holders, even to the extent of fixing a maximum limit to salaries; and if a foreign corporation, to require, as a condition to its right to do business in the State, that it voluntarily bring the salaries of its officers within the same limit.

By GRAVES, J., dissenting, with whom FOX and LAMM, JJ., concur.

1. CONSTITUTIONAL LAW: Right of Foreign Corporation to Raise. A foreign insurance company, which has heretofore been licensed to do business in this State, which has complied with all the requirements of the statutes entitling it to a license to do business in this State, except the one provision of the new statute which is held by the Superintendent of Insurance to bar it from obtaining a license, has the right, though at the time without a license, to raise the question of the constitutionality of the statute.

2. ———: Title: Exclusion of Insurance Companies. An act whose title is, "An Act relating to the Salaries and Compensation of Officers and Agents of Life Insurance Companies," does not give notice that its primary purpose is to exclude from this State foreign life insurance companies which pay their officers salaries in excess of a certain named sum. The Legislature has no concern with the internal workings of foreign corporations, and therefore no right to fix a maximum limit to the salaries of their officers, and as the title indicates only an attempt to regulate the internal affairs of life insurance companies it logically refers to domestic companies only, and gives no hint of its primary purpose, which was to exclude such foreign companies as paid a salary in excess of fifty thousand dollars. The subject of the act, which is exclusion of foreign companies from the State, is not "clearly expressed in its title." At most it leaves the subject in doubt.

3. ———: ———: Two Subjects. It is also unconstitutional because the act itself deals with two subjects, namely, the regu-

lation of the internal affairs of domestic insurance companies, and the exclusion of foreign corporations from doing business in the State.

4. ————: **Police Regulation: Private Contract.** A statute fixing a maximum salary for officers of a life insurance company cannot be upheld as a police regulation, whether the company be a domestic or foreign corporation. A police regulation has for its purpose the prevention of some manifest evil or offense, or the preservation of the public health, safety, morals, or general welfare, and there must be some clear, real and substantial connection between the assumed purpose of the enactment and the thing to be accomplished thereby. The State has the right to say what kind of contracts a life insurance company may make with policy-holders, for therein it is dealing with the general public, but it has no right, under the disguise of a police regulation, to impair its right to contract freely with its officers and employees, and prescribe that their salaries shall not exceed a named sum. That is to interfere with that freedom of private contract which the Constitution guarantees to all alike.

5. ————: **Arbitrary Classification.** A statute which withholds a license to do business from any life insurance company which pays any officer or agent a salary of fifty thousand dollars, in total disregard of the solvency or insolvency of the company, fixes an arbitrary and unreasonable basis for the classification of insurance companies, and is unconstitutional.

## Mandamus.

PEREMPTORY WRIT DENIED.

*O. M. Spencer, Franklin Ferriss* and *Frank Hagerman* for relators.

(1) Each relator has a binding statutory contract by which it is entitled to a renewed certificate by complying with section 7888, and which cannot be impaired. The Act of 1907, if applicable to it, is unconstitutional. 6 Thomp., Corp., sec. 7902; State v. Root, 83 Wis. 667. Upon the faith of these statutes each relator acted, making large investments and building up an extensive business. The Constitution of the State (art. 2, sec. 15), and of the United States (art. 1, sec. 10), both provide that "no State shall . . .

pass any . . . law impairing the obligation of contracts.'' So far as concerns legislative grants of authority to domestic corporations, the courts since the Dartmouth College Case (Trustees of Dartmouth College v. Woodward, 4 Wheat. 518), have recognized them as contracts which cannot be impaired. State ex rel. v. Adams, 44 Mo. 576; Sloan v. Railroad, 61 Mo. 30; State ex rel. v. Greer, 78 Mo. 191; Hovelman v. Railroad, 79 Mo. 643; State ex rel. v. Railroad, 85 Mo. 282; Railroad v. Springfield, 85 Mo. 676. A contract with a foreign corporation as to the terms upon which it may do or continue business cannot be impaired. Am. Smelt. & Ref. Co. v. Colorado, 204 U. S. 103; Railroad v. Penn., 153 U. S. 628; Bedford v. Eastern B. & L. Assn., 181 U. S. 241; British Am. Mort. Co. v. Jones, 76 S. C. 218; State ex rel. v. Cook, 171 Mo. 361; Seaboard Air Line Co. v. R. R. Commission, 155 Fed. 802. (2) The Act of 1907, even if not the impairment of a contract, does not apply to the renewed certificate of authority provided for by section 7888. The Act of 1907 says that any company violating its terms shall not ''be licensed to transact business in this State.'' The language of section 7989 providing for the original authority to all companies, domestic, foreign and alien, provides for ''a certificate . . . authorizing it to do business.'' To ''transact business'' in the Act of 1907 is the same as to ''do business'' in section 7989. Section 7880 requires a company to obtain ''a renewed certificate of authority to continue business,'' which is different language and a different thing from obtaining a license to transact business. This State cannot deprive them of the right to do business—all that it can do is to exclude them from its own borders. State v. Ins. Co., 49 Oh. St. 440; State v. Ins. Co., 39 Minn. 538. (3) By its title this act purports to relate to all life insurance companies, and then only as a regulation of salaries. Section 1 relates alone to domestic

companies, section 2, if, as hereinbefore contended, applicable alone to domestic companies, is beyond the title which covers all companies. If applicable to both foreign and domestic companies, then the bill contains two subjects: (1) a general prohibition against a domestic company paying a salary in excess of $5,000 without the approval of its directors, though it may violate the provision and still be licensed, and (2) a prohibition of a license to any company if more than a $50,000 salary be paid. The title properly construed refers to domestic companies, because the State has no concern 'with salaries paid by foreign companies for services outside of the State. When so construed, section 2, if applicable to foreign companies, deals with a subject not expressed in the title. So, if the act be treated as one of exclusion, then it is invalid because it has no relation to the subject mentioned in the title, which is the regulation of salaries. The constitutional provision is mandatory, and many acts have been declared to be void because conflicting therewith. State ex rel. v. Schofield, 41 Mo. 39; Witzman v. Railroad, 131 Mo. 618; State v. Great Western Coffee & Tea Co., 171 Mo. 640; State ex rel. v. Baker, 129 Mo. 486; State ex inf. v. Borden, 164 Mo. 237; State ex rel. v. Hiege, 135 Mo. 119; Shively v. Lankford, 174 Mo. 545; In re Goode, 3 Mo. App. 230; State v. Persinger, 76 Mo. 346; State ex rel. v. Jackson Co. Ct., 102 Mo. 531. (4) The Act of 1907 is void if applied to salaries paid for services outside of the State. The act cannot be sustained as an exclusion statute because it is not limited to foreign but is applicable to domestic corporations. Carroll v. Greenwich Ins. Co., 199 U. S. 409. (5) The Act of 1907, if sustained at all, must be a reasonable exercise of the police power. It was an unreasonable exercise thereof, and therefore contrary to sections 4 and 15, of article 2, of the State Constitution and the 5th and 14th amendments to the Constitution of the United States. 22 Am. and Eng. Ency.

Law (2 Ed.), 933, 935, 936; Plessy v. Ferguson, 163 U. S. 537; Railroad v. Jacobson, 179 U. S. 301; Lochner v. New York, 198 U. S. 53; Coffeyville Vit. Brick Co. v. Perry, 69 Kan. 297; Railroad v. Wilson (Tex.), 19 S. W. 912; State v. Tie & Timber Co., 181 Mo. 558; State v. Loomis, 115 Mo. 315; State ex rel. v. Norton, 5 Ohio N. P. 183; Street v. Varney Sup. Co., 160 Ind. 338; People v. Coler, 166 N. Y. 1; Braceville Coal Co. v. People, 147 Ill. 66; Com. v. Perry, 155 Mass. 117; State v. Goodwill, 33 W. Va. 179; Godcharles v. Wigeman, 113 Pa. St. 431; State v. Coal & Coke Co., 33 W. Va. 188; Millett v. People, 117 Ill. 294; Ramsey v. People, 142 Ill. 380; Low v. Prtg. Co., 41 Neb. 127; Cleveland v. Clements, 67 Ohio St. 197; People v. Orange Co., 175 N. Y. 84.

*Herbert S. Hadley*, Attorney-General, and *John Kennish, F. G. Ferris* and *Rush C. Lake*, Assistant Attorneys-General, for respondent.

(1) Relators are precluded from assailing the constitutionality of the Act of 1907. Under the facts set forth in the alternative writ, and the law applicable thereto, respondent contends that relators being without authority to transact business in this State, and being "outside, at the threshold, seeking admission, with consent not yet given," have no standing in this court to challenge the constitutionality of the Act of 1907 upon the grounds complained of. The law is well settled that foreign corporations licensed to do business in a State are precluded from challenging the constitutionality of laws in force in such State at the time the corporation was admitted to do business therein, and this principle should apply with greater force to the case of a foreign corporation seeking a license to entitle it to enter and do business in another State. Daggs v. Orient Ins. Co., 136 Mo. 398; State ex inf. v. Standard Oil Co., 194 Mo. 149; Orient Ins. Co. v. Daggs, 172 U. S. 566; Railroad v. Kentucky,

183 U. S. 503. Manchester Fire Ins. Co. v. Herriott, 91 Fed. 711. (2) "If anything can be settled by adjudication, then it is settled that a State can impose upon foreign insurance corporations seeking to transact insurance business in such State such terms and conditions as it may deem proper or may wholly exclude them." Daggs v. Orient Ins. Co., 136 Mo. 393; Security Mutual Life Ins. Co. v. Prewitt, 202 U. S. 246; Doyle v. Continental Ins. Co., 94 U. S. 535; Hooper v. California, 155 U. S. 648; Allgeyer v. Louisiana, 165 U. S. 578; Orient Ins. Co. v. Daggs, 172 U. S. 557; Waters-Pierce Oil Co. v. Texas, 177 U. S. 28; N. Y. L. Ins. Co. v. Cravens, 178 U. S. 289; Hancock Mut. Life Ins. Co. v. Warren, 181 U. S. 73. (3) All insurance companies, whether domestic, foreign or alien, are required by Secs. 7989 and 7888, R. S. 1899, to procure from the Superintendent of Insurance a certificate of authority to do business in this State and to have such certificate renewed annually. (4) Relators were not entitled to a renewal of the certificates of authority, except upon compliance with the laws of this State, including the Act of 1907. Eagle Ins. Co. v. Ohio, 153 U. S. 446; Ins. Co. v. Needles, 113 U. S. 574; 8 Cyc. 938; 15 Am. and Eng. Ency. Law, 1038; State v. Gilmore, 141 Mo. 513. The theory advanced by relators that because investments were made in this State under the laws in force during the life of former licenses, and that thereby an implied contract resulted which may now be used as a basis for challenging the constitutionality of the Act of 1907, is so untenable and without support in reason or authority as to require little attention. Under the Constitution of this State, and under the general law, it was not within the power of one Legislature to barter away the police power of the State, and no reason has been given, or can be given, why any different rule should apply to foreign corporations as being exempt from the general principles of law upon this subject because in-

vestments were made than in the case of individuals or domestic corporations under similar circumstances. Prewitt v. Ins. Co., 26 Ky. L. R. 1240; Railroad v. Penn., 153 U. S. 628. (5) The Act of 1907 contains but one subject, and that is clearly expressed in its title. State v. Cantwell, 179 Mo. 260; O'Connor v. Railroad, 198 Mo. 633; Ex parte Loving, 178 Mo. 205; State v. Doerring, 194 Mo. 398; State v. Delmar Jockey Club, 200 Mo. 34; State v. Murlin, 137 Mo. 305; Coffee v. Carthage, 200 Mo. 616; Blair v. Chicago, 201 U. S. 400; Detroit v. Railroad, 184 U. S. 392. (6) This act is a proper and reasonable exercise of the police power. 1 Tiedeman's State and Federal Control of Persons and Property, p. 237; Holden v. Hardy, 169 U. S. 398. Relators contend that the Act of 1907 is an unreasonable exercise of the police power of the State, in that it fixes the maximum annual salary which an insurance officer may receive at $50,000. Is $50,000 unreasonably low? In fixing such maximum salary at $50,000 per annum, did the Legislature abuse its discretion and make the police power a mere excuse for the oppression and spoliation of insurance companies? The right of regulation and the right to exercise the power of exclusion to secure the right of regulation, has been sustained not only by the courts of this State, but by the decisions of the United States Supreme Court. Eagle Ins. Co. v. Ohio, 153 U. S. 446; Chicago Life Ins. Co. v. Needles, 113 U. S. 574; Philadelphia Fire Assn. v. New York, 119 U. S. 110; Manchester Fire Ins. Co. v. Herriott, 91 Fed. 711; Blake v. McClung, 172 U. S. 239; Daggs v. Orient Ins. Co., 136 Mo. 393; Security Mutual Life Ins. Co. v. Prewitt, 202 U. S. 246; Doyle v. Cont. Ins. Co., 94 U. S. 535; Waters-Pierce Oil Co. v. Texas, 177 U. S. 28; Hancock Mut. Life Ins. Co. v. Warren, 181 U. S. 73.

WOODSON, J.—Relator, a foreign insurance company organized under the laws of New York, seeks by mandamus to compel the State Superintendent of Insurance to renew its license to do business in this State as per the conditions fixed by Revised Statutes 1899, section 7888, which section reads:

*"Renewal of Authority.*—If the said annual statements mentioned in sections 7880 and 7887 shall have been made in conformity with the requirements of said section, and the superintendent, after deducting from said statement all worthless and doubtful assets, shall be satisfied as to the solvency or condition of the company filing the same, and its ability to meet all its engagements at maturity, he shall issue a renewed certificate of authority to such company to continue business; and no company not incorporated under the laws of this State shall continue to do business until a renewed certificate is issued."

An alternative writ was issued from which we gather that relator was at the time of, and for a long time prior to its application for a renewal of its license or certificate to do business in this State, paying and had been paying one of its officers a salary in excess of $50,000 per year; that relator for many years had been doing business in Missouri, and that when it applied for and received its original certificate or license to do business in the State, said section 7888 was then in force, as were also what are sections 7842 and 7989, Revised Statutes 1899; that the relator at the date of its entrance into the State, under the statutes aforesaid, paid the fees and complied with all conditions required by law for its admission to do business in the State, and that during all the time since said date it has complied with the law and has received each year a renewal of its certificate of authority to do business in the State, the last renewal being of date March 1, 1907; that prior to March 1st it complied with all the provisions of said section 7888,

and otherwise complied with the laws of the State, so as to entitle it to a renewal of its certificate to do business on said date, and that it thereby became the duty of respondent, the Superintendent of Insurance, to issue such renewed certificate. The alternative writ then shows the vast volume and character of relator's business in Missouri, as well as the vast sums it has invested in the State in real estate and mortgages, as also the taxes paid to the State by it.

The writ then shows that the respondent refused the renewal of its certificate solely because relator pays one of its officers a salary in excess of $50,000 per year and because to issue the same would be in violation of the following act of the Legislature, enacted in the year 1907:

"An Act Relating to the Salaries and Compensation of Officers and Agents of Life Insurance Companies.

"Section 1. No domestic life insurance company shall pay any salary, compensation, or emolument to any officer, trustee or director thereof, nor any salary, compensation or emolument amounting in any year to more than five thousand dollars to any person, firm or corporation, unless such payment be first authorized by a vote of the board of directors of such life insurance company and the record of such entered in the minutes of the meeting when such action was taken.

"Sec. 2. No life insurance company, which pays as a salary or as compensation for services, or as an emolument or allowance of any kind whatever more than fifty thousand dollars per annum to any one person shall be licensed to transact business in this State."

From the alternative writ it appears that relator attacks the validity of this Act of the General Assembly of Missouri, for the reasons expressed in this language:

"Said Act of 1907 is invalid, void and of no effect as against relator in that (a) the act as properly construed does not apply to foreign insurance companies; (b) the act is unconstitutional in that it limits the compensation of officers, agents and employees of a corporation for all their services within or without the State of Missouri, thereby interfering with the right of contract, contrary to the provisions of sections 4 and 15, article 2, of the State Constitution, and section 10, article 1 of, and the 14th amendment to, the Constitution of the United States; (c) the act is unconstitutional in that it contains more than one subject, and the subject is not clearly expressed in the title, contrary to the provisions of section 28, article 4, of the State Constitution; (d) the act should not in any event be construed to apply to the renewed certificate of authority mentioned in section 7888."

Respondent entered his appearance and by way of return demurred to the sufficiency of the allegations contained in the petition and alternative writ herein, and thereupon asked the judgment of the court. The case is therefore one of law pure and simple.

I.  In my judgment the Act of 1907, entitled, "An Act relating to the Salaries and Compensation of Officers of Life Insurance Companies," is an unwise piece of legislation and should be repealed, but that is a matter to be addressed to the Legislature and not to the courts.  The latter have only to do with the constitutionality and the interpretation of the laws and not the enactment and repeal thereof.

The act in question in express terms applies to all life insurance companies which pay any of their officers or agents over $50,000 a year as salary or compensation; and there is not a word or line therein which remotely indicates, as contended by counsel for relator, that it applies only to companies which were not doing business in the State at the time of

its enactment; but, upon the contrary, the very object
the Legislature intended to accomplish conclusively
shows that it applies to all life insurance companies
regardless of the time when they were authorized to
do business in the State. The purpose of the act was
clearly to prevent the companies from paying their
officers and agents compensation in excess of what
the Legislature thought their services were really worth
and thereby misappropriate and waste the assets of
the companies which should be preserved for the pur-
pose of paying their policies and other obligations.
The Legislature thought, and had good grounds to
think, that some of the foreign life insurance com-
panies doing business in this State were paying some
of their officers and agents too large a compensation
for the services they were rendering to their respective
companies, and were thereby jeopardizing the interest
of the policy-holders of those companies; and in order
to obviate that abuse the Act of 1907 was enacted.
The reason which gave birth to the act applies as
well to the companies which were doing business here
at the time of its enactment as it did to those which
should subsequently come into the State. And if we
recall the history of the investigation of the foreign
life insurance companies which were doing business
in this State during and just prior to the enactment
of this law, then there could be no room for doubt
as to the companies to which it referred. The dis-
closures made by that investigation showed that some
of those companies were paying some of their officers
and agents unreasonable and exorbitant salaries for
the services they were rendering, amounting in some
instances almost to profligacy. Clearly, that was the
cause of the enactment; and if that and other ex-
travagancies and abuses then disclosed had continued
unabated, it would have been only a question of time
when their solvency would have been challenged. In
the light of that history, when we read the act in

question, there can be no doubt but what the Legislature intended the act to apply to all life companies then doing business in the State, as well as those which should thereafter enter.

II. In my judgment that act is not in conflict with section 28 of article 4 of the Constitution which provides that no bill shall contain more than one subject, and that such subject must be clearly expressed in the title of the bill.

The title of the bill in question reads as follows: "An Act relating to the Salaries and Compensation of Officers and Agents of Life Insurance Companies." It is not disputed but what the title of the act clearly indicates that it relates to the salaries and compensation life insurance companies were paying their officers and agents for services rendered and to be performed by them; but the objection lodged against the act is that it contains an additional subject-matter to the one stated in the title of the bill, namely, that a license to do business in this State should not issue to any life insurance company which pays any of its officers or agents more than $50,000 a year for their services.

It is true the act contains the prohibitive section, number two, above mentioned, and that no reference thereto is made in the title of the bill to it. If that section constituted separate and independent subject from the subject stated in the title, then, clearly, the act would be double and unconstitutional, not only on that account, but also for the reason that it is not stated in the title of the act; but if said section two does not contain a separate and independent subject from that expressed in the title of the act, but is germane thereto and naturally relates to the subject therein stated, then the act is single and does not offend against said constitutional provision. [State v. Miller, 45 Mo. 495; Ewing v. Hoblitzelle, 85 Mo. 64; State ex

rel. v. Miller, 100 Mo. 439; State ex rel. Kirkwood v. Heege, 135 Mo. 112; Elting v. Hickman, 172 Mo. 237.]

In the consideration of this constitutional question it should be borne in mind that no statute is valid without a penalty of some kind is prescribed for its violation, and that such penalty may be of any character the Legislature may deem proper to impose, within constitutional limitations. Knowing that fact, the Legislature, in my judgment, enacted the second section of the act as a penalty, if I may so term it, prohibiting the issuance of a license to any life insurance company to do business in this State which pays more than $50,000 to any officer or agent of the company. No authority has been cited holding that the Legislature may not constitutionally impose that kind of a penalty if it sees proper to do so; and I am unable to see any legal objection to its exercise of that power.

We have numerous statutes of similar character, among others, those which prohibit the issuance of a license to a person to run a dramshop who is a man of bad character, or to a person to practice law who is a person not of good character, or who does not possess the required legal qualifications; or to a person to practice medicine or dentistry who is a man of bad character or who does not possess the required medical knowledge or dental skill; or to any foreign corporation to do business in this State which does not first file with the Secretary of State a certified copy of its charter and pay into the State Treasury the license fee prescribed by the statute. Clearly none of those statutes are obnoxious to that constitutional provision, yet the act in each instance prescribes the qualifications of the person and the conditions upon which a license will issue; and, in addition thereto, those statutes prohibit the issuance of the license if the party applying for the license does not possess those qualifications and perform those conditions.

Is there any legal distinction between the various statutes mentioned and the act in question? Certainly not; and I suppose it would not be seriously contended that the latter acts are unconstitutional and void because they are double, or for the reason that the titles of the respective acts do not state both the qualifications and conditions upon which the licenses will issue, and the penalty, if I may so term it, or, more accurately speaking, the section prohibiting the proper officer of the State or county, as the case may be, from issuing the license in the absence of the required qualifications and the performance of the conditions imposed. The validity of all of those acts, including the one in question, and many others, rests upon the well-settled rule of constitutional construction that an act is not double, nor does its title violate the Constitution, when it does not mislead those who read it as to what the bill contains, and is not designed as a cover to vicious and incongruous legislation, even though the title does not express in detail or specifically point out the substance or the various elements which go to make up the one subject-matter which section 28 of article 4 of the Constitution requires to be clearly expressed in the title of the bill. Any matter germane to and naturally connected with the subject so stated in the title is sufficiently covered thereby and is not double within the meaning of that section. [In re Burris, 66 Mo. l. c. 446; State ex rel. v. Mead, 71 Mo. 266; State ex rel. v. Ranson, 73 Mo. 78; State ex rel. v. Laughlin, 75 Mo. 358; State v. Bennett, 102 Mo. 356; Lynch v. Murphy, 119 Mo. 163; State v. Great Western Coffee Co., 171 Mo. 634; State v. Bengsch, 170 Mo. 81; State ex rel. v. Slover, 134 Mo. 10; City of St. Louis v. Weitzel, 130 Mo. 600; State ex rel. v. Marion County, 128 Mo. 427.]

Upon the principle before announced the following, among numerous other acts, has been held by this court to be valid:

Act of 1869, p. 23, sec. 13, requiring insurance companies to give information touching their business and making the offending company guilty of a misdemeanor. [State v. Matthews, 44 Mo. 523.]

The error counsel for relator have fallen into, as it seems to me, is that they erroneously assumed that the Act of 1907, the one in question, fixes the maximum salaries which life insurance companies may pay their officers and agents, and that it also provides for their expulsion from the State. In my judgment, that is a clear misconception of the provisions of the act. The act does not attempt to fix the salaries such companies may pay, nor does it provide for the expulsion of any company from the State. The act prevents the Insurance Commissioner of the State from issuing a license to any company which pays a salary of more than $50,000 a year to any of its officers when such company applies for it. The act in question did not revoke the license of relator which had theretofore been issued to it, but simply prohibits the granting of a new license to it after the expiration of the old one. The license is issued for only a year, and it only authorizes the company to do business in the State during that period.

The license is not in the nature of a contract. Respondent could withdraw from the State at any time it deemed proper to do so, and there is nothing contained in the statute under which its present license was issued indicating that the State is under any legal obligation to renew the license after the expiration of the one it now holds. Nor would the refusal on the part of the State to renew the license, as contended for by counsel for relator, have the effect of impairing the legal obligations of the contracts made and entered into by and between it and third parties during the existence of its present and all former licenses, any more than would the voluntary withdrawal of the company impair them. The only effect

the refusal would have upon the company would be to prevent it from making any new contract or to transact any new business in the State, after the expiration of the license it now holds, but would in no manner affect any former transaction.

Enactments of the Legislature providing for the control and management of corporations doing business in this State for the protection and well-being of its citizens, and licenses issued in pursuance thereof to such corporations to do business herein, are in no sense of the term contracts between the State and the corporations to which they are issued, but are police regulations, which may be amended or repealed by the Legislature at pleasure; and those claiming under such acts have no right to complain and are remediless in the premises.

In the case of Doyle v. Continental Ins. Co., 94 U. S. 535, the Supreme Court of the United States, in discussing this question, said: "The power to revoke can only be restrained, if at all, by an explicit contract upon good consideration to that effect."

In 8 Cyc., at page 938, it is said: "As a license authorizing a person to practice a profession or to carry on a particular business is not a contract which vests a right, but merely the grant of a privilege, such a license is not protected by the constitutional prohibition as to the impairment of the obligation of contracts." And in the foot note 52 of the same page, it is further said: "License to a corporation to do business does not curtail the authority of the State to regulate the conduct of the corporation in the future."

In 15 Am. and Eng. Ency. Law, discussing the constitutional provision now under consideration, at page 1038, the same principle is announced in the following language: "A license to engage in a business or do a thing is not a contract in the constitutional sense, and the law authorizing the license may be repealed."

In the case of State v. Gilmore, 141 Mo. l. c. 513, this court said: "Now, in reference to the claim made by defendant that his predecessor's estate had a contract which could not be impaired by subsequent legislation, it is sufficient to say that there can be no contract without a consideration, 'so that the State can be supposed to have received a beneficial equivalent; for it is conceded on all sides that, if the exemption is made as a privilege only, it may be revoked at any time.' [Cooley, Const. Lim. (6 Ed.), 388, 148 and cases cited.]"

That being unquestionably the law, the relator would have no legal right to complain of the legislation should it repeal the statutes authorizing it and all other foreign corporations from doing business in this State, much less so where the act only excludes them upon condition that they do certain things required, or refrain from doing certain things prohibited in the act.

The foregoing observations are fully supported by what is said by the following:

In Beale on Foreign Corporations, in section 126, discussing the equal protection of the last clause of the fourteenth amendment, that author says: "So, where a foreign insurance company was doing business in New York under a license renewable by the law of New York every year, it was held to be within the power of New York to impose new conditions. For the corporation was within the jurisdiction of New York only for a year; at the end of the year the corporation ceased to have the power to act within the State, and, therefore, to be within the jurisdiction until it complied with the new conditions. 'It could not be of right within such jurisdiction, until it should receive the consent of the State to its entrance therein under the new provisions, and such consent could not be given until the tax, as license fee for the future, should be paid.' [Philadelphia Fire Ass'n v. New

York, 119 U. S. 110; Manchester Fire Ins. Co. v. Herriott, 91 Fed. 711; Blake v. McClung, 172 U. S. 239.]''

In the Philadelphia Fire Association case, supra, it appears from the agreed statement of facts that the insurance company was organized under the laws of Pennsylvania, and had been doing an insurance business in the State of New York since 1872, its license having been renewed annually, as required by the laws of New York; that after it had been doing business in said State of New York for about ten years, the latter State enacted a law requiring the payment by a foreign insurance company of certain fees and taxes, in addition to what had been required theretofore; that said insurance company refused to pay such additional fees and taxes for the reason that the act of the General Assembly requiring such payment was unconstitutional and void. A suit was instituted by the Superintendent of Insurance for the recovery of such fees, and the insurance company challenged the constitutionality of said act of the Legislature on the ground that it was violative of the fourteenth amendment of the Federal Constitution, in that it denied to the defendant the equal protection of the laws. The facts in that case are fully set out in the opinion, and are, in many respects, similar to the facts in the cases at bar. After the cause had passed through the courts of the State of New York, it was removed by writ of error to the Supreme Court of the United States, which court, discussing the law and the facts agreed upon at page 116, said:

''The provision of the fourteenth amendment, which went into effect in July, 1868, is that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' The first question which arises is, whether this corporation was a person within the jurisdiction of the State of New York, with refer-

ence to the subject of controversy and within the meaning of the amendment.

"The defendant on the assumption that if it was within the jurisdiction of the State of New York, it was, though a foreign corporation, 'a person,' and so entitled to the benefit of the amendment, contends that it was within such jurisdiction. The argument is, that it established an agency within the State in 1872, which it had ever since maintained; that it complied, from year to year, with all the requirements and conditions imposed by the laws of the State on foreign fire insurance companies doing business in the State; that it received from year to year certificates of authority from the Superintendent of the Insurance Department, as provided by statute; that, under those circumstances, it was legally within the State and within its jurisdiction; that being in the State, by permission of the State, continuously from 1872 to 1882, the State imposed on it, while there, in 1882, an unequal and unlawful burden, and that the New York act of 1865 did not come into effect as to Pennsylvania corporations until the Pennsylvania act of 1873 was passed, at which time the defendant had already been a year in the State.

"But we are unable to take that view of the case. In Paul v. Virginia, 8 Wall. 168, at December term, 1868, a statute of Virginia required that every insurance company not incorporated by Virginia should, as a condition of carrying on business in Virginia, deposit securities with the State Treasurer, and afterwards obtain a license; and another statute made it a penal offense for a person to act in Virginia as agent for an insurance company not incorporated by Virginia without such license. A person having acted as such agent without a license, and been convicted and fined under the statute, this court held that there had been no violation of that clause of article 4, section 2, of the Constitution of the United States, which pro-

vides that 'the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states;' nor any violation of the clause in article 1, section 8, giving power to Congress 'to regulate commerce with foreign nations and among the several states.' The view announced was, that corporations are not citizens within the clause first cited, on the ground that the privileges and immunities secured to the citizens of each state in the several states, are those which are common to the citizens of the latter states, under their constitutions and laws, by virtue of their being citizens; and that, as a corporation created by a state is a mere creation of local law, even the recognition of its existence by other states, and the enforcement of its contracts made therein, depend purely on the comity of those states— a comity which is never extended where the existence of the corporation or the exercise of its powers is 'prejudicial to their interests or repugnant to their policy.' And the court, speaking by Mr. Justice FIELD, said: 'Having no absolute right of recognition in other states, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely, they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion.' As to the power of Congress to regulate commerce among the several states, the court said, that while the power conferred included commerce carried on by corporations as well as that carried on by individuals, 'issuing a policy of insurance is not a transaction of commerce.' This decision only followed the principles laid down in the earlier cases of Bank of Augusta v. Earle, 13

Pet. 519, 588, and Lafayette Ins. Co. v. French, 18 How. 404.

"The same rulings were followed in Ducat v. Chicago, 10 Wall. 410, where it was said that the power of a state to discriminate between her own corporations and those of other states desirous of transacting business within her jurisdiction being clearly established, it belonged to the state to determine as to the nature or degree of discrimination. 'subject only to such limitations on her sovereignty as may'be found in the fundamental law of the Union.'

"Other cases to the same effect are Liverpool Ins. Co. v. Massachusetts, 10 Wall. 566; Doyle v. Continental Ins. Co., 94 U. S. 535; and Cooper Mfg. Co. v. Ferguson, 113 U. S. 727. . . .

"This Pennsylvania corporation came into the State of New York to do business by the consent of the State, under this act of 1853, with a license granted for a year, and has received such license annually, to run for a year. The State, having the power to exclude entirely, has the power to change the condition of admission at any time, for the future, and to impose as a condition the payment of a new tax, or a further tax, as a license fee. If it imposes such license fee as a prerequisite for the future, the foreign corporation, until it pays such license fee, is not admitted within the State or within its jurisdiction. It is outside, at the threshold, seeking admission, with consent not yet given."

In the Manchester Fire Insurance Case, supra, upon a state of facts not dissimilar to those of the case just considered, the court, after a full discussion of the law in many cases bearing upon this subject, at page 719, said: "An examination of the statutes of the State of Iowa shows that for years it has been incumbent upon all foreign insurance companies to obtain a renewal each year of their license to continue in business in the State, and, unless such license in the

form of a certificate was issued, the company had no right to continue the transaction of insurance within the State. The ground of complaint in the present instance is that the State has imposed certain conditions as a prerequisite to the issuance of a license enabling the companies to continue in business during the coming year, and these conditions are complained of as onerous, and as making a discrimination between the license tax exacted from corporations created under the laws of other nations, as compared with domestic or sister state corporations. In Pembina Con. Silver Mining & Milling Co. v. Pennsylvania, 126 U. S. 181, 8 Sup. Ct. 737, it is expressly held that 'the State is not prohibited from discriminating in the privileges it may grant to foreign corporations as a condition of their doing business or hiring offices within its limits;' and if it be true as it undoubtedly is—that the State may impose such conditions as it deems best upon the privilege of obtaining a license to do business in the State during the coming year, the courts cannot release the companies from the obligation to perform the conditions, if they wish to continue in business during the coming year. If the conditions imposed are onerous, discriminatory, or otherwise inexpedient, relief must come from the legislature and not from the courts. The argument for complainants is largely based upon the thought that, when foreign corporations are once admitted within the State, they are entitled under the provisions of the State and Federal constitutions to insist that they shall be subjected to the same burdens of taxation as may be imposed upon similar corporations engaged in the like business. If the license tax provided for in section 1333 was a tax upon property, real or personal, owned by the companies within the State, there would be much force in the argument; but that is not the fact. This license tax is the condition imposed by the State upon the privilege of engaging or continuing in business within the

State. It is optional with the companies whether they will subject themselves to the burden or not, but they cannot enjoy the privilege of continuing in business in the State except upon compliance with the terms which the State has seen fit to impose as a condition to the exercise of the privilege. In the adoption of section 1333 the State was not exercising its right of taxation, in which event it would have been subject to the provisions of the State Constitution requiring equality in the burdens imposed; but the State was exercising its undoubted right to prescribe the terms upon which foreign corporations may be allowed to continue in the business of insurance within the State, and, as the right to impose terms is possessed by the State, it is not for the courts to question the expediency or justice of the conditions enacted by the State.''

In the McClung case, at page 260, the court said: ''It is equally clear that the Virginia corporation cannot rely upon the clause declaring that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' That prohibition manifestly relates only to the denial by the State of equal protection to persons 'within its jurisdiction.' Observe, that the prohibition against the deprivation of property without due process of law is not qualified by the words 'within its jurisdiction,' while those words are found in the succeeding clause relating to the equal protection of the laws.''

As above stated, the Legislature may not only impose such conditions upon foreign corporations coming into the State as it may deem proper, but it may also exclude them entirely from the State. [Daggs v. Orient Ins. Co., 136 Mo. l. c. 393; Security Mutual Life Ins. Co. v. Prewitt, 202 U. S. 246; Doyle v. Continental Ins. Co., 94 U. S. 535; Hooper v. California, 155 U. S. 648; Allgeyer v. Louisiana, 165 U. S. 578; Orient Ins. Co. v. Daggs, 172 U. S. 557; Waters-Pierce Oil Co. v. Texas, 177 U. S. 28; N. Y. L. Ins. Co. v. Cra-

vens, 178 U. S. 389; Hancock Mut. Life Ins. Co. v. Warren, 181 U. S. 73.]

In the Daggs case, supra, this court, l. c. 390, said:

"The defendant assails this statute on the ground that it violates section 1 of the fourteenth amendment of the Constitution of the United States. As a predicate for this position defendant argues at length, and cites authorities to show that 'a corporation' is 'a person,' within the meaning of the Constitution of the United States. [Railroad v. Mackey, 127 U. S. 205; Santa Clara Co. v. Railroad, 118 U. S. 394.]

"But granting that a corporation is a person, within the meaning of the Constitution, for certain purposes, surely no proposition is better settled than that the Constitution of the United States nowhere deprives this State of the power and right to prescribe the conditions upon which it will permit foreign corporations to do business within its boundaries. [Paul v. Virginia, 8 Wall. 168; Philadelphia Fire Ass'n v. New York, 119 U. S. 110; Doyle v. Insurance Co., 94 U. S. 535; Bank v. Earle, 13 Pet. 519.] Again and again it has been held that the whole matter of admitting foreign corporations to do business in the State rested absolutely in the discretion of the Legislature of the State. The terms it imposes may be reasonable or unreasonable. The comity ordinarily extended is accompanied by no legal sanction. The State, having extended it, may at any time revoke it. This is the doctrine steadily maintained alike by State and Federal decisions. [Doyle v. Wisconsin, 94 U. S. 50; Doyle v. Ins. Co., Ibid, 535; Ducat v. Chicago, 10 Wall. 415; Ibid v. Ibid, 48 Ill. 172; Insurance Co. v. French, 18 How. 404; Railroad v. Koontz, 104 U. S. 11; Carroll v. East St. Louis, 67 Ill. 568; Insurance Co. v. Davis, 29 Mich. 238; Noble v. Mitchell, 46 Am. & Eng. Corp. Cas. 525; State ex rel. v. Root, 83 Wis. 667; Dugger v. Ins. Co., 32 S. W. (Tenn.) 5.] . . . .

"It was held by the Supreme Court that issuing policies of insurance is not a transaction of commerce. They are not interstate transactions, though the parties thereto are domiciled in different states. They are local transactions, and governed by local law. As to 'the privileges and immunities secured to citizens of each state in the several states' by the other clause relied upon, it was held they were 'those privileges and immunities which are common to the citizens in the latter states under their constitutions and laws by virtue of their being citizens.' 'It was not intended by the provision to give to the laws of one state any operation in other states.' Said Mr. Justice FIELD: 'Now, a grant of corporate existence is a grant of special privileges to the corporations, enabling them to act for certain designated purposes as a single individual and exempting them (unless otherwise specially provided) from individual liability. The corporation being the mere creation of local law, can have no legal existence beyond the limits of the sovereignty where created. As said by the court in Bank of Augusta v. Earle, 'it must dwell in the place of its creation, and cannot migrate to another sovereignty.' The recognition of its existence even by other states, and the enforcement of its contracts made therein, depend purely upon the comity of those states—a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy."

In the Prewitt case, 202 U. S. 246, the court said, at page 257: "As a state has power to refuse admission to a foreign insurance company to do business at all within its confines, and as it has power to withdraw that permission when once given, without stating any reason for its action, the fact that it may give what some may think a poor reason or none for a valid act is immaterial. . . . Thus it is admitted that a state has power to prevent a company from coming

into its domain, and that it has power to take away its right after having been permitted once to enter, and that right may be exercised from good or bad motives.''

And in the Doyle case, supra, the court said, at page 540:

''The cases of Bank of Augusta v. Earle, Ducat v. Chicago, Paul. v. Virginia and Lafayette Insurance Co. v. French, establish the principle that a state may impose upon a foreign corporation, as a condition of coming into or doing business within its territory, any terms, conditions and restrictions it may think proper, that are not repugnant to the Constitution or laws of the United States. The point is elaborated at great length by Chief Justice Taney in the case first named, and by Mr. Justice Field in the case last named.

''The correlative power to revoke or recall a permission is a necessary consequence of the main power. A mere license by a state is always revocable. [Rector v. Philadelphia, 24 How. 300; People v. Roper, 55 N. Y. 629; People v. Commissioners, 47 N. Y. 50.] The power to revoke can only be restrained, if at all, by an explicit contract upon good consideration to that effect. [Humphrey v. Paynes, 16 Wall. 244; Tomlinson v. Jessup, 16 Id. 454.]

''A license to a foreign corporation to enter a state does not involve a permanent right to remain, subject to the laws and Constitution of the United States. Full power and control over its territories, its citizens, and its business, belong to the State.

''If the State has the power to do an act, its intention, or the reason by which it is influenced in doing it, cannot be inquired into. Thus, the pleading before us alleges that the permission of the Continential Insurance Company to transact its business in Wisconsin is about to be revoked, for the reason that it removed the case of Drake from the State to the Federal courts.

"If the act of an individual is within the terms of the law, whatever may be the reason which governs him, or whatever may be the result, it cannot be impeached. The acts of a state are subject to still less inquiry, either as to the act itself or as to the reason for it. The State of Wisconsin, except so far as its connection with the Constitution and laws of the United States alters its position, is a sovereign state, possessing all the powers of the most absolute government in the world.

"The argument that the revocation in question is made for an unconstitutional reason cannot be sustained. The suggestion confounds an act with an emotion or a mental proceeding, which is not the subject of inquiry in determining the validity of a statute. An unconstitutional reason or intention is an impracticable suggestion, which cannot be applied to the affairs of life. If the act done by the State is legal, is not in violation of the Constitution or laws of the United States, it is quite out of the power of any court to inquire what was the intention of those who enacted the law. . . .

"The effect of our decision in this respect is, that the State may compel the foreign company to abstain from the Federal courts, or to cease to do business in the State. It gives the company the option. This is justifiable, because the complainant has no constitutional right to do business in that state; that state has authority at any time to declare that it shall not transact business there. This is the whole point of the case, and, without reference to the injustice, the prejudice, or the wrong that is alleged to exist, must determine the question. No right of the complainant under the laws or Constitution of the United States, by its exclusion from the State, is infringed; and that is what the State now accomplishes. There is nothing, therefore, that will justify the interference of this court."

And in the case of Waters-Pierce Oil Company v. Texas, supra, at page 45, the court said:

"In Paul v. Virginia, 8 Wall. 168, 181, the dependent and derivative rights of corporations were again declared. Bank of Augusta v. Earle was quoted from, and it was again decided that a corporation is the mere creation of local law, and can have no legal existence beyond the limits of the sovereignty where created, and the recognition of its existence in other states, and the enforcement of its contracts made therein, depend purely upon the comity of those states.

"Having no absolute right of recognition in other states, but depending for such recognition and enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion.

"And it was also decided that a corporation did not have the right of its personal members, and could not invoke that provision of section 2, article 4, of the Constitution of the United States, which gave to the citizens of each state the privileges and immunities of citizens of the several states. See, also, Pembina Mining Co. v. Penn., 125 U. S. 181; Ducat v. Chicago, 10 Wall. 410. And it has since been held in Blake v. McClung, 172 U. S. 239, and in Orient Insurance Company v. Daggs, 172 U. S. 557, that the prohibitive words of the fourteenth amendment have no broader application in that respect.

"In Blake v. McClung, a Virginia corporation was denied the right to participate upon terms of equality with Tennessee creditors in the distribution of the

assets of a British corporation in the hands of a Tennessee court.''

In 1 Joyce on Insurance, section 328, the law on this subject is stated as follows: ''The legislature has power to prescribe the conditions upon which foreign insurance companies shall be permitted to transact business within its territory, and effect will be given such statutes in all the courts of the United States, and it may prohibit foreign companies from transacting business within its territory and enforce its prohibition by penal enactments. It is held that the legislature may restrict the business of such corporations to particular localities, and may require security for the performance of its contracts as shall be deemed for the best interests of its own citizens, since a foreign corporation has no absolute right of recognition in other states. A corporation is a mere creature of local law; it can have no legal existence beyond the limits of the state of its creation, and is entitled to no recognition in other states, except upon the principle of comity. It is not a citizen within those clauses of the Federal Constitution which provide for citizens of each state all the privileges and immunities of citizens in the several states.''

And in 3 Clark & Marshall on Private Corporations, section 844 (a) the law is stated as follows: ''While a corporation may be recognized and permitted to exercise its powers in another state than that by which it was created, this, we have seen, is not a matter of absolute right, but depends upon the express or implied consent of the other state. It is a matter of comity. It is well settled, therefore, that a state may exclude a foreign corporation altogether from doing business or acquiring property within its limits, or it may impose any conditions or restrictions which it may see fit to impose, provided it does not thereby violate any provision of its own Constitution or of the Constitution of the United States. It was said,

in substance, in a leading case in the Supreme Court of the United States: The recognition of a corporation's existence by other states, and the enforcement of its contracts made therein 'depends purely upon the comity of those states'—a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy. Having no absolute right of recognition in other states, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion.''

The contention of counsel for relator, that because of its investment of large sums of money in this State, relying upon the license heretofore granted it under the statute in force when granted, constitutes an implied contract between it and the State, and that it cannot be violated by an amendment or repeal of the statute without contravening the Constitutions of the State and of the United States is untenable, for two reasons: first, because there is nothing in the statute indicating in the remotest degree that the State Insurance Superintendent was authorized by issuing the license to enter into an irrevocable contract with relator; but, upon the other hand, the statute in plain and express terms authorizes the Insurance Superintendent to issue a *license* and not to enter into a contract with each of the various insurance companies of the country whereby the State would surrender and barter away its sovereign power, right and duty to regulate and control them for the protection and wel-

fare of the public. Not.only that, but the statute in question in express terms only authorizes the Superintendent to issue the license for one year, thereby clearly indicating that it was not the intention of the Legislature to authorize the Superintendent to enter into a contract with the various insurance companies every time he issued to one of them a license to do business in this State.

The second reason why relator's contention is unsound is, that under the Constitution and laws of this State, the Legislature, even though it had intended and attempted to so bind the State by contract, has no power to do so. The Legislature has no power or authority to contract away the police power of the State, which is inherent and inseparable from sovereignty itself, and which has no limitations whatever, except those written in the Constitutions of the State and of the United States. [State ex rel. v. Standard Oil Company, 218 Mo. 1.]

This same question came before the Court of Appeals of the State of Kentucky in the case of Prewitt, Commissioner, v. Security Mutual Life Ins. Co., 26 Ky. Law Rep. 1239. It was there contended by the defendants, foreign life insurance companies, in opposition to the right asserted by the Commissioner of Insurance to revoke their licenses theretofore issued, granting them permission to transact business in that State, that because they had on the faith of the licenses employed a large number of agents, established a large number of agencies throughout the State, expended large sums of money in advertising its business, and acquiring a large and profitable business in the State, and that by means thereof the companies had acquired rights in the State that would preclude the commissioner from legally revoking their licenses. The contention of the insurance companies was denied by the court, and on appeal the Supreme Court of the United States affirmed the judgment of the Court of Appeals

of Kentucky. [Security Mutual Life Ins. Co. v. Prewitt, 202 U. S. 246.]

III. In my judgment, the act in question, as before stated, is but the lawful exercise by the Legislature of the police power of the State. Whether or not this particular act is wise or unwise does not concern the courts, without it is violative of the State or Federal Constitution.

It is contended that the Legislature of this State in the exercise of its police powers cannot control the internal affairs of foreign corporations by fixing the salaries they may or may not pay to their officers or agents for services rendered. I do not understand that the Attorney-General makes any such contention; but even if he does, it would be wholly immaterial, for the reason that the act under consideration does not in the remotest degree attempt to or undertake to fix what salaries foreign life insurance companies may pay their officers and agents, but simply provides that no company which pays any of their officers more than $50,000 shall do business in this State. All the act does is to prohibit all such companies from transacting business in this State—nothing more. It does not provide that such companies shall not pay any of its officers or agents more than $50,000. To illustrate: Suppose the act had provided that no foreign life insurance company could do business in this State whose president was not a citizen of this State and of the United States, would it be seriously contended that such an act would be an interference with the internal affairs of such company, and thereby violate its constitutional rights to contract with its officers and agents? I think not. While the act might be a foolish piece of legislation, yet I apprehend that such act would not be unconstitutional upon the ground that it was interfering with the election of the president of a foreign insurance company, or other internal

affairs of the company. The directors could, and I dare say would, go ahead notwithstanding such act, and would elect whomsoever they pleased as president of the company, and the validity of such election would not be affected by the act, nor would the validity of the act be affected by the election. The two acts would have no relation whatever with each other, but if the company should elect a citizen of England and then apply for a license to do business in this State, then there can be no question but what the act would be valid, and would bar the company from the State.

The reason for that is, as was before shown by all of the authorities, that the State may by statute exclude any and all foreign corporations from doing business in the State, with or without giving any reason whatever therefor; and if the Legislature sees fit to give a reason for their exclusion, it may give a good or a bad excuse, wise or foolish one. That is a matter resting solely in the discretion of the Legislature, and over which the courts have no control.

While I believe this particular act is unwise, because I believe some men are worth more than $50,000 a year to some of the great foreign life insurance companies, yet it cannot be successfully contended that such an act is wrong upon principle, for the reason that it is the duty of the Legislature when it believes the public interest is in danger to enact laws for the public protection. If it possessed information justifying the belief that the life insurance companies doing business in this State were uselessly extravagant and profligate in the expenditure of their assets in paying exorbitant salaries or otherwise, and were thereby jeopardizing the interests of their policy-holders, who have millions of dollars invested in their policies of insurance, then it would be the plain duty of the Legislature to enact proper laws to remedy such evils. To illustrate, suppose a life insurance company of some foreign state or country, over which this State has no jurisdiction,

should agree to pay its president $1,000,000 a year and its other officers and agents in that proportion, which would exceed, say, the net profits of the company, and thereby necessitate their payment out of the beneficiary funds held for the policy-holders, and thereby jeopardize their interests, would it be contended that such a company should not be excluded from doing business in this State? Certainly not. There would be no difference in principle between the two acts, yet the latter would be highly reasonable while the former might be characterized as very unreasonable; but the reasonableness or unreasonableness of a law is something with which the courts have nothing to do; as before stated, that matter rests exclusively with the lawmakers.

All such institutions are organized for a two-fold purpose, first, for private gain; and, second, insurers of the public. The latter characterizes them as public institutions and subjects them to the supervision and control of the State under the exercise of the police power. Under that power the Legislature may enact any and all laws which will safeguard and protect the interest of her policy-holders; and, if necessary, it might enact a valid law prohibiting domestic life insurance companies from paying salaries and other running expenses of the company out of the funds held for the benefit of the policy-holders; but having no jurisdiction over foreign companies, the Legislature might and has with propriety required of them to voluntarily perform certain conditions before they shall be permitted to transact business in this State; and the Legislature possesses the unlimited power to impose any and all additional requirements that it may deem just and proper for the purpose of protecting the interest of the people of this State, even to the extent of excluding them altogether from the State. [See authorities cited under paragraph two hereof.]

The authorities cited and relied upon by counsel for relator are not in point, and do not support the propositions there contended for. The statute involved in those cases applied to private parties and companies and not to public institutions, like banks and insurance companies.

In our judgment the peremptory writ of mandamus should be denied, and it is so ordered.

*Valliant, C. J., Burgess* and *Gantt, JJ.,* concur. *Graves, J.,* dissents in separate opinion, in which *Fox* and *Lamm, JJ.,* concur.


## DISSENTING OPINION.

GRAVES, J.—I do not concur in the majority opinion herein for reasons which I will in due order state. First, however, I deem it advisable to eliminate from consideration several questions which I do not dispute, and which questions eliminate the greatest portion of the opinion from consideration.

I do not claim and have never claimed that a mere license to a foreign corporation to do business in this State is an irrevocable contract between such corporation and the State, so that the State is precluded from changing the terms and conditions of its admission into the State by duly enacted laws which are not violative of constitutional provisions. I concede and have always conceded the right of the State, by valid and constitutional provisions, both to absolutely exclude foreign corporations, and to regulate the business of such corporations in the State. To the contention of relator that there is an inviolable contract between itself and the State I do not now and never have given my assent, but there is nevertheless some force in the contention and some authority to support it. The weight of authority is strongly the other way,

To my mind there are but two questions necessary to be discussed in this case, and they are (1) is

this Act of 1907 violative of either State or Federal constitutional provisions, and (2) if so, then is relator in a position to raise the question of the constitutionality of the statute? Of. these in inverse order.

I. The right of the relator to raise the question of the constitutionality of the Act of 1907 seems to be conceded in the majority opinion, although not discussed. But at the threshold of this case the respondent, through the Attorney-General, challenges the right of the relator to assert the unconstitutionality of the Act of 1907, *supra,* and we feel that it merits consideration. The contention is that at the time this writ was sued out, March 12, 1908, the relator was not licensed to do business in the State, and hence was not within the jurisdiction of this State so as to entitle it to invoke the provisions of the Federal Constitution or of the State Constitution. In other words, the respondent contends that relator was simply knocking at the door for admission, and as a foreigner can not question the constitutionality of our laws. This requires a close study of our statutes. Statutes from other states lend but little light.

By section 7842, Revised Statutes 1899, it is provided: "It shall be the duty of the superintendent of the insurance department . . . . to issue certificate of authority to transact insurance business in this State to any companies who have fully complied with the laws of this State."

Section 7989 provides: "No company shall transact in this State any insurance business, unless it shall first procure from the superintendent of the insurance department of this State a certificate stating that the requirements of the insurance laws of this State have been complied with, authorizing it to do business; a copy of which certificate, certified by the superintendent, and issued only upon the request of the president or secretary, or other chief officer

of the company, or of a general agent of the company for this State, notice of whose appointment has been filed in this department, shall be held by every agent or solicitor for such company doing business for such company within this State, and such copy shall, in some convenient and distinct manner, set forth the name of the person, agent or solicitor for whose use it is issued. Every such company shall be required to procure annually, for the use of its agents and solicitors, copies of the renewal certificate of authority, provided for by law.''

It will be noticed that this section provides for the issuance of an original certificate of authority. But before getting the original certificate certain requirements are made of foreign insurance companies, and these we find in sections 7883, 7884 and 7885, which read:

''No insurance company not incorporated by, or organized under the laws of this State shall transact any insurance business by an agent or agents in this State, unless it shall first file in the office of the superintendent of the insurance department a duly certified copy of its charter or act of incorporation, together with a statement, under the oath of the president and secretary of such company, showing the condition of the affairs of said company on the first day of January next preceding the date of such oath. The statement shall be in the same form, and shall set forth the same particulars as the annual statement required of companies organized under the laws of this State. Such company shall also file a copy of its last annual report, made in compliance with any law of the state or county by which said company was incorporated, if any such report shall have been made.

''It shall not be lawful for any such company organized or incorporated under the laws of the United States, or of any other state of the United States, to transact in this State any business men-

tioned in section 7852, unless one hundred thousand dollars of the capital or assets of such company be invested in treasury notes or bonds of the United States, or in bonds of the State of Missouri, or of the State under the laws of which such company is incorporated, or loaned on notes or bonds secured by mortgage or deeds of trust on unencumbered real estate, worth at least double the amount loaned thereon, nor unless securities of the kind or kinds aforesaid to the actual value of one hundred thousand dollars shall have been deposited for the security of its policy-holders, with the superintendent or commissioner of insurance or chief financial officer of the State, and under and by the laws of the State, in which such company is incorporated, or, if such company is incorporated under the laws of the United States, with some financial officer of the United States, or with the superintendent of the insurance department of this State, or with the officer in charge of like insurance deposits in any other State of the United States: Provided, that any such company not having such deposit made in the State in which it is organized, or with some officer of the United States, may make such deposit in this State in the manner and subject to the provisions set forth in this article.

"It shall not be lawful for any such company mentioned in the preceding section, unless such company have made a deposit in this State, as in said section provided, to transact in this State any business mentioned in section 7852, until it shall have filed with the superintendent of the insurance department of this State the certificate of the commissioner or superintendent or chief financial officer aforesaid, under his hand and official seal, certifying that he holds in trust and on deposit, for the benefit of all policy-holders of such company, the notes, bonds and securities before mentioned, and stating the kind of such notes, bonds and securities, and the amount of

each, and that he is satisfied they are worth one hundred thousand dollars.''

When these three sections have been complied with, then it becomes the duty of the Superintendent of Insurance to issue the original certificate of authority to do business in this State, and the company becomes a citizen of the State, with full right to challenge the constitutionality of laws thereafter passed during the time of its citizenship.

By section 7880 both domestic and foreign companies doing business in this State are required to file in the office of the Superintendent of Insurance a certain detailed sworn report of their business, which report must be filed on January 1st or within sixty days thereafter, for the year ending December 31st next preceding. In the case at bar relator had obtained the original certificate under the requirements of sections 7883, 7884 and 7885, supra, which had been renewed from year to year up to and including the renewal of date March 1, 1907.

These renewal certificates are specifically provided for by section 7888, which reads:

''If the said annual statements mentioned in sections 7880 and 7887 shall have been made in conformity with the requirements of said section, and the superintendent, after deducting from said statement all worthless and doubtful assets, shall be satisfied as to the solvency or condition of the company filing the same, and its ability to meet all its engagements at maturity, he shall issue a renewed certificate of authority to such company to continue business; and no company, not incorporated under the laws of this State, shall continue to do business until a renewed certificate is issued.''

It should be noted that the commissioner ''shall issue a renewal certificate.'' The statute is mandatory. When once satisfied of the solvency, which is

admitted in this case, the further act of issuing the license is purely ministerial.

Section 7887 mentioned in the above section refers to companies organized in foreign countries and not to companies organized under the national laws, or the laws of other States of the Union. So that up to the Act of 1907, upon the filing of the report as required by section 7880, if the Superintendent of Insurance was satisfied with the solvency and condition of the company, then he was obliged to issue the renewal certificate. Going to the facts of the case at bar it appears that prior to March 1, 1908, and during the life of the renewed certificate of date March 1, 1907, relator filed the report required by section 7880. Under the admitted facts the respondent in this case was satisfied with the report and the thorough solvency of relator. All this was done whilst relator was domiciled in the State, and at a time when it had a right to challenge the constitutionality of the Act of 1907. It further appears from the admitted facts that the only reason for a refusal of the renewed certificate by respondent was this Act of 1907, supra.

It will be observed that the right to this renewed certificate is made to depend solely upon the report required by section 7880. In this respect it differs materially from the original certificate. An entirely different showing is required for the original certificate, as will be seen by a reading of the statutes. This report was made during the life of the renewed certificate for 1907. With this report the respondent was fully satisfied. At that time the relator was legally domiciled in Missouri, if we be permitted to use that expression, and had full right to challenge this law on constitutional grounds. When relator filed this report under section 7880, prior to March 1, 1908, it amounted in law to an application for a renewal certificate, for such is the purpose of the report. The

law makes no provision for another or different application for a renewed certificate. This application was at a time when relator had the right to question the constitutionality of a law passed subsequent to its entrance into the State. Then when it filed this petition March 12, 1908, it simply sought to enforce rights held by it on the date of filing the report prior to March 1, 1908, and sought in this court to enforce such rights, and among others the right to challenge this Act of 1907. If the act is void it was the duty of respondent to have issued the renewed certificate upon the application being made in the manner aforesaid. This petition for mandamus relates back to the time when relator was entitled to have its report passed upon and approved or rejected at which time relator was legally domiciled in this State, although a foreign corporation. By this statement we mean that it was so domiciled in the State as to give it the right to challenge unconstitutional laws. It acquired that right by virtue of the original certificate, and the renewed certificate is but to the effect that it was still in good standing under the original certificate, which original gave to it admission to the State. Under the facts in this record we are of opinion that relator is in position to question the constitutionality of the law now under consideration. And in this we heartily concur in what we take to be an acquiescence in this position by the majority opinion.

II.    Grant it to be true that the State by constitutional laws can wholly prohibit, or in any manner regulate the business methods of foreign corporations by law, yet it does not follow that, after the corporation has been admitted, and is in fact doing business in the State, it can be precluded therefrom, or have its business regulated by an unconstitutional act. In Carroll v. Greenwich Insurance Co., 199 U. S. l. c. 409, Mr. Justice HOLMES says: "A company lawfully

doing business in the State is no more bound by a general unconstitutional enactment than a citizen of the State. [W. W. Cargill Co. v. Minnesota.]'' And grant it further for sake of argument only that the State can even exclude by an unconstitutional law any or all foreign corporations from first coming into the State, and that such applicants for admission cannot challenge the law upon constitutional grounds, either State or Federal, yet, such rule does not apply to the facts of the case at bar. By certain sections of the law, fully quoted, supra, foreign insurance companies were required to do certain things before being admitted to do business in the State, among others to file copies of their articles of association, and either make a deposit of one hundred thousand dollars in solvent securities here, or satisfy the Superintendent of Insurance that such deposit had been made elsewhere. Under the showing required by these sections relator procured the original certificate to do business in the State. This certificate has long been held by relator. This conferred the right to do business and the renewed certificate provided for in section 7888 conferred the right ''to continue business in the State.''

It may be true (a question we do not decide, because unnecessary in this case) that a foreign corporation, not domiciled in the State but simply applying for admission, cannot even question a law upon the statutes at the time of its proposed entry in the State, yet that does not affect this case, because the Act of 1907 was passed whilst relator was actually in the State doing business.

We think, however, the rule is well stated in 3 Clark & Marshall on Private Corporations, sec. 844a, wherein it is said: ''While a corporation may be recognized and permitted to exercise its powers in another State than that by which it was created, this, we have seen, is not a matter of absolute right, but

is a matter of comity. It is well settled therefore that a State may exclude a foreign corporation altogether from doing business or acquiring property within its limits, or it may impose any conditions or restrictions which it may see fit to impose, provided that it does not thereby violate any provisions of its own constitution or of the Constitution of the United States.''

III. Under the conceded right of the relator to challenge the constitutionality of this new law, as clearly indicated by the opinion of my brothers, I proceed now to the real question in this case, *i. e.*, the constitutionality of the Law of 1907. This question my brothers in the majority touch only slightly, but devote nine-tenths of their opinion to matters about which there is but little question in the books and decided cases, and no question in my mind. Now to the real question in the case. The Act of 1907 must be considered from a double standpoint in determining its constitutionality. First, is the act one of exclusion as applied to foreign insurance companies and if so is it impregnable as against constitutional darts? Second, is the act the mere exercise of the police power of the State, and if so is it valid? In this paragraph we take the first question, leaving the other for a succeeding paragraph.

It is urged by counsel that the act does not apply to foreign insurance companies at all. For the present at least, this question will be put aside.

Grant it that the body of the act so far as foreign insurance companies are concerned, was intended as an exclusion statute, then it is urged that the act is invalid and void as violative of article 4, section 28, of our State Constitution, which in so far as applicable to this discussion, reads: "No bill . . . *shall contain more than one subject,* which shall be clearly expressed in the title.'' The title of this act

reads: "An Act relating to the Salaries and Compensation of Officers and Agents of Life Insurance Companies." One reading this title, without looking at the body of the bill, would hardly suppose that the bill had any reference to foreign companies, and this for the reason that the Legislature of this State have no concern with the internal workings of foreign corporations. Our laws cannot affect them except by way of absolutely excluding them, or regulating them whilst here under the general police power of the State. Had there been added to the title above quoted the words, "and Excluding from this State Foreign Insurance Companies Paying Salaries in Excess of those Provided for in This Act," then the title would have been clearly expressive of the meaning of the act itself as contended for by respondent. But if the act is an exclusion statute, and that is the sole subject of the act (for under the Constitution there can be but one subject) then is that subject clearly expressed in the title? We think not. Who, reading this title without seeing the body of the bill, would for a moment suppose that the bill was dealing with the exclusion of foreign insurance companies from the State? Yet that is the purpose of the constitutional limitation. If the idea of excluding foreign insurance companies is clearly expressed in this title to the Act of 1907, then we confess we are and for many years have been in the dark, as to the meaning of the words "clearly expressed." That the subject of a bill "shall be clearly expressed in its title" is just as mandatory as that "no bill . . . shall contain more than one subject," is well recognized.

As said in State v. Burgdoerfer, 107 Mo. l. c. 30: "The title must express the subject of the act in such terms that the members of the General Assembly and the people may not be left in doubt as to what matter is treated of."

In State v. Great Western Coffee and Tea Co., 171 Mo. l. c. 643, after quoting the above from the Burgdoerfer case, it was said: "And it is elsewhere said very aptly 'that to be clearly expressed certainly does not mean something that is dubious and therefore is not clearly expressed.'"

In this case, Fox, J., reviews many authorities from this and other jurisdictions. Among others the case of the City of Kansas City v. Payne, 71 Mo. wherein, at l. c. 162, the following language from Judge Cooley is quoted with approval: "The Constitution has made the title the conclusive index to the legislative intent. It is no answer to say that the title might have been more comprehensive, if, in fact, the Legislature has not seen fit to so make it."

The act is not only void because the subject thereof is not clearly expressed in the title, but for the further reason that the bill itself deals with two subjects, i. e. (1) a regulation as to the management of the internal affairs of domestic insurance companies, and (2) the exclusion of foreign insurance companies.

That there are two subjects is made clearly manifest, when we consider the act and the applicable law. The Legislature had the power, within reasonable bounds, to regulate the internal management and affairs of domestic corporations. Whether this act is within reasonable bounds as to such corporations, we will not discuss here, because not in this case. But it is equally clear that the Legislature has no power or right to regulate the internal affairs of foreign companies. As to foreign corporations our laws extend to the State lines and no further. That we cannot regulate the internal management of foreign companies is axiomatic and needs no citation of authority. As to them, our Legislature can do but two things: (1) pass laws to regulate the conduct and character of their business in this State, if they enter the State

with the permission of the State, and (2) laws excluding them entirely.

It is presumed that the Legislature knew the limitation of its powers, and in this act was not attempting to regulate the internal affairs of foreign insurance companies, but as to them intended the act as one of exclusion, and as to domestic companies as an act of regulation with reference to the internal management of such companies. Viewing it in this light there are two subjects covered by this act, and if so it is violative of the constitutional mandate, supra.

As said by Burgess, J., in Witzmann v. Railroad, 131 Mo. l. c. 618: "Adjudicated cases do not as a general rule afford as much assistance in passing upon questions of this character, other than in a general way, as each case must be adjudged according to its own peculiar facts and the directness or remoteness, as the case may be, of its provisions to matters in consonance with its title." And in the same case and on the same page in discussing an act of the Legislature pertaining to street railways, it was said: "By the title of the act in question its provisions are restricted to tickets, fares, taxes and licenses as applicable to street railroads in the city of St. Louis, and subjects germane thereto, and by no rule of construction which can reasonably and fairly be given to it can it be held that the provisions of section 4 in regard to gates and guards on such cars are germane to the title of the act, which contains no intimation whatever that any such provisions are to be found in it. The very facts that the words tickets, fares, taxes and licenses are used in the title, indicates that the act contains no provision with respect to guards and gates on the platforms of the cars, matters that are entirely foreign to the purpose and intention of the act as shown by its title, hence the act relates to more than one subject, and is in conflict with the Con-

stitution.   Taking the title of the act as a guide to its provisions, no one would think of·finding in it a provision pertaining to attachments or appurtenances to the cars.''

The above is cited with approval by Fox, J., in State v. Great Western Coffee & Tea Co., supra.

So in this case when it is remembered that the Legislature can legislate as to the internal management of domestic corporations and cannot so legislate as to foreign corporations, who by reading the title to this act, would infer for a moment that the bill covered the subject of excluding foreign corporations from doing business in this State?   Nor is the subject of excluding foreign corporations germane to the subject of regulating. the internal government and management of domestic corporations.

We are therefore of the opinion, that, if the act in question was intended for an exclusion statute, it is violative of section 28 of article 4 of our State Constitution, and this for two reasons (1), that the subject is not clearly expressed in the title, and (2) that the act itself deals with two separate and distinct subjects.

IV.   But treating the act as the exercise of the police powers of the State, and not as an exclusion statute, can it stand?   We think not, and in so saying, we are considering it from the standpoint of domestic corporations, as well as foreign corporations.   The police powers of the State cannot reach the internal government and management of foreign corporations. The fixing of salaries for its agents and officers is a part of the internal management of the corporation. The foreign corporation has the right to manage its internal affairs as it sees fit under the laws of the State giving it birth.   This State can exclude a foreign corporation by law, but it cannot regulate its internal management in the State of its creation.   Laws in the

exercise of police powers, like other laws, lose their force when the State lines are reached. That such laws apply to the foreign corporations in this State and to its public business transacted in the State, there can be no question, provided that the law is the reasonable exercise of the police powers of the State. All such laws, to be valid, must be the reasonable exercise of the police powers. This law as a police regulation attempts to interfere with the rights of contract, and as such can it be upheld? It not only says to the foreign insurance company, "You shall be excluded, if you make a private contract with an employee, by which you agree to pay him more than $50,000 per year for his services," but it likewise says to the domestic corporation that it can't so contract.

In 22 Am. and Eng. Ency. Law (2 Ed.), 938, 939, it is said: "In order that a statute or ordinance may be sustained as an exercise of the police power, the courts must be able to see (1) that the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals, or general welfare, and (2) that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable and appropriate manner tend toward the accomplishment of the object for which the power is exercised. The police power cannot be used as a cloak for the invasion of personal rights or private property, neither can it be exercised for private purposes, or for the exclusive benefit of particular individuals or classes. . . . The police power must be so exercised as not to infringe arbitrarily or unreasonably upon personal or property rights."

An unreasonable exercise of this power has been held to be violative of the Fourteenth Amendment to the Federal Constitution, and in our judgment is violative of the Federal Constitution. [Lochner v. New

York, 198 U. S. 45; Adair v. U. S., 28 Sup. Ct. Rep. 277.]

In the first case, Mr. Justice PECKHAM says: "The State, therefore, has power to prevent the individual from making certain kinds of contracts, and in regard to them the Federal Constitution offers no protection. If the contract be one which the State, in the legitimate exercise of its police power, has the right to prohibit, it is not prevented from prohibiting it by the Fourteenth Amendment. Contracts in violation of a statute, either of the Federal or State government, or a contract to let one's property for immoral purposes, or to do any other unlawful act, could obtain no protection from the Federal Constitution as coming under the liberty of persons or of free contract. Therefore, when the State, by its Legislature, in the assumed exercise of its police powers, has passed an act which seriously limits the right to labor or the right of contract in regard to their means of livelihood between persons who are *sui juris* (both employer and employee) it becomes of great importance to determine which shall prevail—the right of the individual to labor for such time as he may choose, or the right of the State to prevent the individual from laboring or from entering into any contract to labor, beyond a certain time prescribed by the State. . . . We think the limit of the police power has been reached and passed in this case. There is in our judgment no reasonable foundation for holding this to be necessary or appropriate as a health law to safeguard the public health, or the health of individuals who are following the trade of a baker. If this statute be valid, and if, therefore, a proper case is made out in which to deny the right of an individual, *sui juris,* as employer or employee to make contracts for the labor of the latter under the protection of the provisions of the Federal Constitution there would seem to be no length to which legislation of this nature might not

go . . . . This interference on the part of the legislatures of the several States with the ordinary trades and occupations of the people seems to be on the increase . . . It is impossible for us to shut our eyes to the fact that many of the laws of this character, while passed under what is claimed to be the police power for the purpose of protecting the public health or welfare, are, in reality, passed from other motives. We are justified in saying so when, from the character of the law and the subject upon which it legislates, it is apparent that the public health or welfare bears out the most remote relations of the law. The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or it not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose . . . . It is manifest to us that the limitation of the hours of labor as provided for in this section of the statute under which the indictment is found, and the plaintiff in error convicted, has no such direct relation to, and no such substantial effect upon, the health of the employee, as to justify us in regarding the section as really a health law. It seems to us that the real object and purpose were simply to regulate the hours of labor between the master and his employees (*all* being men, *sui juris*) in a private business, not dangerous in any degree to morals, or in any real or substantial degree to the health of employees. Under such circumstances the freedom of master and employee to contract with each other in relation to their employment, and in defining the same, cannot be prohibited or interfered with without violating the Federal Constitution.''

And in the latter case of Adair v. United States, supra, the opinion of Mr. Justice Harlan is to the same effect.

In the well-considered case of Brick Co. v. Perry, 69 Kan. l. c. 299, it is said: "Besides, the Legislature has no power to impair or limit the reasonable and lawful exercise of a right guaranteed by the Constitution, under the guise of a police regulation. It must also be remembered that the right which the plaintiff claims is violated did not originate in contract, but was purely statutory; therefore, the determination of the question whether he has any remedy depends entirely upon the validity of this statute. The right to follow any lawful vocation and to make contracts is as completely within the protection of the Constitution as the right to hold property free from unwarranted seizure, or the liberty to go when and where one will. One of the ways of obtaining property is by contract. The right, therefore, to contract cannot be infringed by the Legislature without violating the letter and spirit of the Constitution." And further on page 301-2 of the same report, and in the same case, it was further said: "It is at liberty to contract for the services of persons in any manner that is satisfactory to both. No legislative restrictions can be imposed upon the lawful exercise of these rights. Within the past two decades there has been an epidemic of this class of legislation. New York, New Jersey, Pennsylvania, Ohio, Indiana, Illinois, Missouri, Wisconsin, Colorado and California have similar statutory provisions, and in such States where the constitutionality of these statutes has been before the courts the law has been universally held to be a denial of the rights guaranteed by the provisions of the National and State constitutions."

In a review of the cases, the Kansas court reviews and approves State v. Julow, 129 Mo. 163.

Tiedeman in his work on Limitations of Police Powers, sec. 178, says: "Laws, therefore, which are designed to regulate the terms of hiring in strictly private employments, are unconstitutional, because

they operate as an interference with one's natural liberty, in a case in which there is no trespass on private rights, and no threatening injury to the public. And this conclusion not only applies to laws regulating the rate of wages of private workmen, but also any other law, whose object is to regulate any of the terms of hiring, such as the number of hours of labor per day, which the employer may demand. There can be no constitutional interference by the State in the private relation of master and servant except for the purpose of preventing frauds and trespasses.''

It must throughout be borne in mind that the right to contract involved in this case is as to the private management of the corporation. No contract with the public is here involved. It may be granted that an insurance company is so much of a quasi-public corporation as will justify and permit the lawmakers to impose certain conditions upon the contracts made with the general public, but that is not the question here.

The contract here involved is the private contract between an employer and employee. The law says to the domestic corporation, You shall not make a private contract of this character, no matter how valuable the services of the employee may be. If this law is valid, a violation thereof would forfeit the charter. To the foreign corporation doing business in this State, this law says, If you make or have made such a contract we will exclude you. With such contract the State has nothing to do. We regulate contracts with public service corporations, when the contracts are between the corporation and members of the general public, and pertain to public business, but it does not follow that the State can fix terms as to wages to be paid on the contract made by the corporation as an employer with those whom it, in its private capacity, employs to do the public service. If it can fix the price of wages to be paid, it can with equal propriety say

that the right is in the State to say what price shall be paid for a horse, a house or a vehicle, necessary for the private use of the corporation in the prosecution of its business.

BURGESS, J., in State v. Tie and Timber Co., 181 Mo. l. c. 559, after a review of many cases, reaches this conclusion: "The right to labor or employ labor, and make contracts with respect thereto, upon such terms as may be agreed upon, is both a liberty and property right, and is included in the guaranty of the Constitution which provides 'that no person shall be deprived of life, liberty or property without due process of law.' [Sec. 30, art. 2, Constitution.] Nor can such right to contract be arbitrarily interfered with, but may be subject to limitations growing out of duties which the individual owes to society, but such limitation must be upon some reasonable basis, and not arbitrarily. [Ritchie v. People, 155 Ill. 98.]"

So that we say that, in so far as the insurance company makes contracts with the general public, the State, in the exercise of its police powers, can put reasonable restrictions upon the terms of the contract. It can even prescribe the form of the contract, and this for the reason that the unsuspecting public may be fully protected in dealings with the corporation. Contracts of insurance are oftentimes too intricate for general public understanding. So, too, the State in the exercise of its police powers may regulate other matters as between such corporations and the general public. However, the case before us is quite different. The contract involved is not one with the general public, but is the private contract between employer and employee.

In Godcharles & Co. v. Wigeman, 113 Pa. St. l. c. 437, the court says: "The . . . sections are utterly unconstitutional and void inasmuch as by them an attempt has been made by the Legislature to do what in this country cannot be done; that is, prevent per-

State ex rel. v. Vandiver.

sons who are *sui juris* from making their own con-contracts. The act is an infringement alike of the right of the employer and the employee.''

In discussing certain mining statutes of this State, which in effect limited the right of contract between employer and employee, Judge BLACK, in the case of State v. Loomis, 115 Mo. l. c. 320, said: "The constitutional declaration, that no person shall be deprived of life, liberty or property without due process of law, was designed to protect and preserve their existing rights against arbitrary legislation as well as against arbitrary executive and judicial acts. The sections of our statute in question deprive a class of persons of the right to make and enforce ordinary contracts and they introduce a system of State paternalism which is at war with the fundamental principles of our government, and, as we have before said, are not due process of law.''

Many other cases might be cited, but these will suffice to indicate our views. We are of opinion that this act, construed as a police regulation and as the exercise of the police power of the State, can not stand, because violative of the right to make private contracts, a right guaranteed alike by the State and Federal Constitutions.

But it has been suggested that the right to make private contracts is not involved in this case. This might be true if the statute is to be treated as an exclusion statute solely, and applied to foreign corporations only. If, however, it is a statute enacted under the police powers of the State and applies to both domestic and foreign corporations, then the right of private contract is involved in this case. The State steps in and says to the domestic corporation, ''You cannot make a private contract, except you permit the State to dictate and prescribe the terms and price to be paid.'' We say the terms and price, because once conceded that the State in the exercise of its police power can

say to two parties *sui juris,* ''You can contract as to employment, but the employer shall not pay the employee more than so much per day, per week or per year for specified services,'' there is no end to the matter. If the State can fix a price beyond which the parties cannot go, it can fix a price below which they cannot go. There is no difference between the two, either in principle or law. If the State can fix a maximum or minimum, or both, which the majority opinion in effect holds, then by the same token it can fix the exact price to be paid by an insurance company to each of its employees. If the State can fix the terms of a contract as to price, why can't it go further and fix other terms of the contract? Under the majority opinion no valid reason can be assigned.

One step further, if the State, in the exercise of that great but indefinable power, called the police power, can regulate the private contracts between an insurance company organized under the laws of this State, and its employees, then it can take every corporation which transacts a public business, and fix a schedule of rates for each class of employees. With the insurance companies, the schedule would run from office boy to president. With the railroads, it would run from section laborer to president. With the hotels, from bell boy to manager. Great indeed would be the powers of the Legislature, when the logical conclusions are legitimately drawn from the opinion of the majority. Seekers of employment would no longer go to those desiring to employ, with a view to agreeing upon a contract of employment, but they would flock to the Legislature and have the terms of their respective contracts fixed, and the only thing for the employer to do would be to assent to the employee entering upon the contract thus made by the Legislature. If this law is a rightful exercise of the police powers of Missouri, as held by my brothers, then the right of private contract, held to be a property right,

has received its death knell in the State. That the question of the right to make private contracts is involved in this case is as certain as it is that the question whether or not this law is the proper exercise of the police power is involved. The majority opinion recognizes that the law is the product of this reserved power of the State, and in holding the law valid, has held that the State can intermeddle with the private contracts of its citizens. You can't say that the law involves the question as to whether or not there has been a proper exercise of the police power, without further saying that in determining that question is involved an investigation as to whether or not the right of contract has been infringed upon by the law.

V. The question of solvency is not in this case. It is admitted that relator is solvent and in financial shape to meet its obligations. The only reason assigned for refusing this license to relator is that said relator, in the exercise of a right guaranteed to it by the Constitution of this State, the Constitution of the Government and every State in the Union, has seen fit to enter into a private contract with one of its employees, wherein it has agreed to pay one employee more than $50,000 per annum for services. It is not contended in the record that such services are not worth the price, nor that the relator had no need in its business for a man whose services were worth to it that price. In this connection it would be well to note that this law says not a word about solvency. The general public is interested in the solvency of insurance companies, but they are not interested in the price paid to employees unless it has some relation to the question of solvency. Had this Act of 1907 precluded such insurance companies from doing business in this State, which were paying such salaries and expenses, as would affect their solvency, and placed the regulation on that ground, then we might have a different proposition before us. But

such is not the case before us and we need not go further than to consider what is in fact before us.

There is, however, another question as to this law. As suggested, the law does not make solvency a basis of its classification of insurance companies, whether they be domestic or foreign. The law adopts as an arbitrary basis of classification of acceptable and non-acceptable companies, the salaries paid their officials. This is an arbitrary and unreasonable basis of classification. [Darlington Lumber Co. v. Railroad, 216 Mo. 658.]

In the above cited case this court quoted with approval the following from the pen of Justice BREWER in Railroad v. Ellis, 165 U. S. l. c. 155: "But it is said that it is not within the scope of the Fourteenth Amendment to withhold from States the power of classification, and that if the law deals alike with all of a certain class it is not obnoxious to the charge of a denial of equal protection. While, as a general proposition, this is undeniably true (Hayes v. Missouri, 120 U. S. 68; Railroad v. Mackey, 127 U. S. 205; Walston v. Nevin, 128 U. S. 578; Railroad v. Pennsylvania, 134 U. S. 232; Pacific Express Co. v. Seibert, 142 U. S. 339; Giozza v. Tiernan, 148 U. S. 657; Columbia Southern Railway v. Wright, 151 U. S. 470; Marchant v. Railroad, 153 U. S. 380; Railroad v. Matthews, 165 U. S. 1), yet it is equally true that such classification cannot be made arbitrarily. The State may not say that all white men shall be subjected to the payment of the attorney's fees of parties successfully suing them and all black men not. It may not say that all men beyond a certain age shall be alone thus subjected, or all men possessed of a certain wealth. These are distinctions which do not furnish any proper basis for the attempted classification. That must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is pro-

posed, and can never. be made arbitrarily and without any such basis."

In State v. Loomis, 115 Mo. l. c. 314, this court said: "But classification for legislative purposes must have some reasonable basis upon which to stand. It must be evident that differences which would serve for a classification for some purposes furnish no rea-son whatever for a classification for legislative purpos-es. The differences which will support class legisla-tion must be such as in the nature of things furnish a reasonable basis for separate laws and regulations. Thus the Legislature may fix the age at which per-sons may be deemed competent to contract for them-selves, but no one will claim the competency to con-tract can be made to depend upon stature or color of the hair. Such a classification for such purpose would be arbitrary and a piece of legislative despotism, and therefore not the law of the land."

See the Darlington case, *supra,* for a full list of authorities and a review thereof upon this question of an arbitrary basis for a classification.

This law selects the salaries paid to officials as a basis of classification. Under its terms our people may be precluded from the more reliable insurance and have forced upon them the less reliable companies. But this is really beside the question. The law in our opinion is invalid in having an arbitrary and un-reasonable basis for the classification of insurance companies.

Nor do we think there is anything in the question that the law only fixes these provisions in the nature of penalties as suggested in the majority opinion. There is not a line in the whole act from title to the last word therein indicating that it is a penal statute.

To our mind this law is violative of both State and Federal constitutional provisions, and relator is entitled to the peremptory writ of mandamus. *Fox,* and *Lamm, JJ.,* concur in these views.